IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

MARCO GUIRLANDO                                          PLAINTIFF

v.                          Civil No. 1:20-cv-01007

SHERIFF RICKY ROBERTS; CAPTAIN                          DEFENDANTS
RICHARD MITCHAM; LT. KEVIN
PENDLETON; LT. PAUL KUGLER;
LT. BILLY PERRY; SGT JOHN WARD;
SGT. JEDIDIAH COTTON; DR. DEANNA
HOPSON; and NURSE SHERIE RICE

## REPORT AND RECOMMENDATION

Before the Court is a Motion for Summary Judgment filed by Defendants Roberts, Mitcham, Pendleton, Kugler, Cotton and Rice. (ECF No. 73).[1] Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3)(2011), the Honorable Susan O. Hickey, Chief United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.

## I. BACKGROUND

### A. Procedural Background

Plaintiff is currently incarcerated in the Federal Detention Center in Miami, Florida. His claims in this lawsuit arise from his incarceration in the Union County Detention Center ("UCDC") in 2019 and 2020. Plaintiff filed his initial Complaint on March 12, 2020. (ECF No. 1). The following day, the Court ordered Plaintiff to file an Amended Complaint to state his claims against

---

[1] Defendant Dr. Deanna Hopson also filed a Motion for Summary Judgment. (ECF No. 70). On July 8, 2021, the Court entered a Report and Recommendation recommending Defendant Hopson's motion be granted dismissing all claims against her. (ECF No. 89). On August 5, 2021, the Honorable Susan O. Hickey, Chief United States District Judge, adopted the Report and Recommendation *in toto*. (ECF No. 90).

each Defendant with factual specificity on the Court's approved § 1983 form.  (ECF No. 5).  On

April 29, 2020, Plaintiff filed an Amended Complaint.  (ECF No. 20).  On May 13, 2020, Plaintiff's

application to proceed *in forma pauperis* was granted.  (ECF No. 25).  On May 27, 2020, Plaintiff

filed a Second Amended Complaint.  (ECF No. 27).

On July 21, 2020, attorney Richard E. Worsham entered his appearance on behalf of

Plaintiff.  (ECF No. 40).  On November 20, 2020, counsel for Plaintiff filed an Amended

Complaint naming the following individuals as Defendants:  Sheriff Ricky Roberts, Captain

Richard Mitcham, Lieutenant Kevin Pendleton, Lieutenant Paul Kugler, Lieutenant Billy Perry,

Sergeant John Ward, Sergeant Jedidiah Cotton, Dr. Deanna Hopson, and Nurse Sherie Rice.[2]  (ECF

No. 60).[3]  Plaintiff is suing Defendants in their individual and official capacities and is seeking

compensatory and punitive damages.  *Id.* at p. 12.

Specifically, Plaintiff states he was subjected to numerous incidents of abuse and

unjustified punishments at the hands of Defendants and "a list of incidents includes, but is not

limited to:"

    a.  Defendant Richard Mitcham leaked grievances made by Plaintiff to staff
        members of the correctional facility and to inmates, which lead to assaults
        by inmates upon Plaintiff and abuse by correctional officers;

    b.  Defendants, Lt. Billy Perry, Sgt. Ward and Sgt. Jedidiah Cotton subjected
        Plaintiff to mental abuse and physical abuse;

    c.  Defendant Lt. Kevin Pendleton subjected Plaintiff to mental abuse;

    d.  Defendant Lt. Kevin Pendleton withheld mail directed to Plaintiff;

    e.  Defendant Sgt. Jedidiah Cotton sexually assaulted Plaintiff and turned off
        his body camera to prevent any recording of the poor medical treatment
        Plaintiff was receiving from the medical staff;

    f.  Defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Lt. Kevin

---

[2] Neither Lieutenant Billy Perry nor Sergeant John Ward were ever served with process in this lawsuit.
Consequently, Plaintiff's claims against these Defendants are not properly before the Court and should be dismissed.

[3] "It is well-established that an amended complaint supercedes an original complaint and renders the original
complaint without legal effect." *In re Atlas Van Lines, Inc*., 209 F.3d 1064, 1067 (8th Cir. 2000). Thus, the
Amended Complaint (ECF No. 60) filed on November 20, 2020, is the operative pleading in this case.

Pendleton, Lt. Paul Kugler, Lt. Billy Perry, Sgt. Ward and Sgt. Jedidiah Cotton placed Plaintiff in the detention area colloquially referred to by staff and officers as 'the hole' as punishment for instigating a fight, even though he was attacked by another inmate for being an alleged informant;

g.  Defendants Sheriff Ricky Roberts, Captain Mitcham, Kt. Kevin Pendleton, Lt. Paul Kugler, Lt. Billy Perry, Sgt. Ward and Sgt. Jedidiah Cotton ignored Plaintiff's request for medical treatment about an injury to his hand for a week;

h.  Defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Lt. Kevin Pendleton, Lt. Paul Kugler, Lt. Billy Perry, Sgt. Ward and Sgt. Jedidiah Cotton placed Plaintiff in solitary confinement for 20 days without justification;

i.  Defendants Sheriff Ricky Roberts, Captain Richard Mitcham, Lt. Kevin Pendleton, Lt. Paul Kugler, Officer Lt. Billy Perry, Sgt. Ward and Sgt. Jedidiah Cotton placed Plaintiff in the 'intake pod' which is used to quarantine new inmates to determine if they have the COVID-19 virus;

j.  Defendant Nurse Sherie Rice initially improperly wrapped Plaintiff's injured hand and did not check on the status of the injury while Plaintiff was in solitary confinement;

k.  Defendant Sgt. John Ward assaulted Plaintiff while taking him to solitary confinement and made threats to Plaintiff;

l.  Defendant Lt. Kevin Pendleton encouraged other inmates to retaliate against Plaintiff for his grievances;

m.  Defendant Lt. Kevin Pendleton watched other inmates steal Plaintiff's possessions and took no action against the inmates or to prevent the actions of the other inmates;

n.  Defendant Lt. Kevin Pendleton informed other inmates that Plaintiff was filing grievances against them;

o.  Defendants Cpt. Richard Mitcham, Lt. Kevin Pendleton, Lt. Paul Kugler, and Lt. Billy Perry labeled Plaintiff as an informant;

p.  Defendants Cpt. Richard Mitcham, Lt. Kevin Pendleton, Lt. Paul Kugler, and Sgt. Jedidiah Cotton retaliated against Plaintiff for filing grievances;

q.  Defendants Cpt. Richard Mitcham, Lt. Kevin Pendleton, Lt. Paul Kugler, and Lt. Billy Perry refused to act upon any grievances filed by Plaintiff;

r.  Defendants Cpt. Richard Mitcham, Lt. Kevin Pendleton, and Lt. Paul Kugler refused to take action against any inmate for stealing Plaintiff's property or any action to stop said stealing;

s.  Defendants Sheriff Ricky Roberts, Cpt. Richard Mitcham, Lt. Kevin Pendleton, and Lt. Paul Kugler were aware of the abuse and mistreatment of Plaintiff by the officers and inmates at the Union County Jail a/k/a Union County Detention Center and took no action to stop said abuse and mistreatment.  In fact, Defendants, Sheriff Ricky Roberts, Cpt. Richard Mitcham, Lt. Kevin Pendleton, and Lt. Paul Kugler encouraged said abuse

3

and mistreatment;

t. Defendant Dr. Deanna Hopson refused to provide necessary medical treatment to Plaintiff;

u. Defendant Dr. Deanna Hopson refused to place Plaintiff's hand in a cast, allow Plaintiff to see as specialist, or provide any follow-up therapy;

v. Defendant Dr. Deanna Hopson refused to follow the proper sanitary protocol as it pertains to changing the wrap on Plaintiff's hand;

w. Defendant Nurse Sherie Rice refused to provide necessary medical treatment to Plaintiff;

x. Defendant Nurse Sherie Rice refused to place Plaintiff's hand in a cast, allow Plaintiff to see a specialist, or provide any follow-up therapy;

y. Defendant Nurse Sherie Rice refused to follow the proper sanitary protocol as it pertains to changing the wrap on Plaintiff's hand;

z. Defendants Sheriff Ricky Roberts, Cpt. Richard Mitcham, Lt. Kevin Pendleton, and Lt. Paul Kugler, refused to follow proper procedure in the imposition of punishment of Plaintiff;

aa. Defendants Sheriff Ricky Roberts, Cpt. Richard Mitcham, Lt. Kevin Pendleton, and Lt. Paul Kugler refused to follow the directives of the Arkansas Department of health regarding the reduction of the spread of COVID-19 in correctional facilities issued on April 15, 2020.

(ECF No. 60, pp. 3-6).

In Count I, Plaintiff claims Defendants were aware of Plaintiff's serious medical condition "but deliberately disregarded it". (ECF No. 60, p. 7-9). In Count II, Plaintiff alleges Defendants "subjected Plaintiff to physical, mental, and sexual abuse in violation of Plaintiff's constitutional rights." *Id.* at p. 9. In Count III, Plaintiff alleges Defendants "refused to follow the directive of the Arkansas Department of Health", issued on April 15, 2020, to reduce the spread of COVID-19 in correctional facilities". *Id.* at p. 10.

Plaintiff also asserts a breach of contract claim under state law in Count IV against Defendant Rice. (ECF No. 60, pp. 11-12). He claims she has a contract of employment with Union County to provide medical care and treatment for inmates in the UCDC and Plaintiff was a third-party beneficiary to that contract. Plaintiff alleges Defendant Rice breached her duty to

provide medical care and treatment to him.  *Id.* at p. 12.

On March 18, 2021, Defendants Cotton, Kugler, Mitcham, Pendleton, Rice and Roberts filed their Motion for Summary Judgment.  (ECF No. 73).  They argue the motion should be granted because:  1) Defendants are entitled to qualified immunity; 2) Defendants were not deliberately indifferent to Plaintiff's medical needs; 3) there is no evidence Plaintiff suffered any physical, mental, or sexual abuse as a result of the actions, or inactions, of Defendants; 4) none of the Defendants were deliberately indifferent to any "excessive or substantial" risk of Covid-19 with respect to Plaintiff; 5) Defendant Rice did not breach any contract to provide medical care to Plaintiff; and 6) there is no proof of any unconstitutional county policy or custom of Union County which was the "moving force" behind any alleged violation of Plaintiff's rights.  (ECF No. 75).  In support of the motion, Defendants submitted a Statement of Facts (ECF No. 74), a Brief (ECF No. 75), Plaintiff's Deposition Transcript (ECF No. 74-1), and affidavits from Defendants Cotton (ECF No. 74-2), Roberts (ECF No. 74-3), Rice (ECF No. 74-4), Mitcham (ECF No. 74-5), and Kugler (ECF No. 74-6).

On April 29, 2021, Plaintiff filed a Response to the motion for summary judgment.  (ECF No. 83).  He also filed disputed Statements of Fact (ECF No. 85), and a Brief in Support of his Response. (ECF No. 87).  Plaintiff argues Defendants are not entitled to summary judgment because he filed numerous grievances against Defendants which should be viewed in the light most favorable to Plaintiff regarding his claims and Plaintiff testified in his deposition concerning the various incidents supporting his claims.  *Id.* at pp. 4-7.   Plaintiff argues there are material issues of fact in dispute and summary judgment is improper.  *Id.* at p. 7.

**B. Factual Background**

In February of 2019, Plaintiff was arrested and incarcerated in the UCDC where he remained until September of 2019, when he was transferred to several other jails in Texas, Oklahoma, and Colorado. (ECF No. 74-1, p. 29). In January of 2020, Plaintiff was again incarcerated in the UCDC where he remained until September 2020, when he was transferred to the Ouachita County Jail in Camden, Arkansas. *Id.*

Plaintiff initially sought medical treatment on April 3, 2019, following an altercation with another inmate named Moffett, and presented with bruising and swelling on the palm and top of his right hand. (ECF No. 70-1, p. 3). That same day Dr. Hopson referred Plaintiff to SAMA Healthcare Services for an x-ray, which showed a slightly impacted fracture to the head and neck of Plaintiff's second metacarpal. *Id.* at pp. 3, 12. In response, she prescribed Plaintiff Ibuprofen and Acetaminophen, and ordered that Plaintiff's hand be wrapped with soft roll in his palm, keeping the fingers cupped. *Id.* at p. 3. The following day, after consulting with an orthopedist, Dr. Hopson also ordered Plaintiff's fingers be buddy taped together by the UCDC's medical staff daily. *Id.* While there were multiple instances where Plaintiff refused to allow fresh wrapping to be applied, or otherwise removed his tape against medical orders, by and large the wrapping was changed as ordered. *Id.* at pp. 5, 6, 10, 11, 20, 21, 22. Dr. Hopson also met with Plaintiff and reviewed his x-rays with him, noted he was doing well with buddy taping his fingers, and that his bruises and swelling were resolving. *Id.* at p. 4.

Dr. Hopson reevaluated Plaintiff's finger at least six (6) times and ordered another set of x-rays six weeks after the injury occurred. (ECF No. 70-1, pp. 4-8). On June 14, 2019, Dr. Hopson ordered the nurses to discontinue buddy wrapping Plaintiff's hand and ordered Plaintiff to start to work his knuckles. *Id.* at p. 11. Dr. Hopson ordered Plaintiff not to do pushups or put pressure on

his hand.  *Id.*  When Nurse Kasie Sanford relayed the order to Plaintiff, he reported he had done pushups earlier and his hand was sore.  *Id.*

Dr. Hopson reevaluated Plaintiff on March 16, 2020, because Plaintiff complained of nerve pain.  Plaintiff requested to see a specialist for his hand and stated he wanted surgery.  (ECF No. 70-1, p. 25).  Dr. Hopson determined there was no need for an x-ray because Plaintiff's bones were all stable.  *Id.*  She offered Plaintiff Tylenol or Ibuprofen, but Plaintiff refused.  *Id.*  Dr. Hopson also explained to Plaintiff that he had full range of motion and there was no need to see a surgeon.  *Id.*

Dr. Hopson treated Plaintiff again on March 30, 2020, because Plaintiff complained of pain in his right index finger.  (ECF No. 70-1, pp. 26, 34).  Plaintiff stated he wanted to get the opinion of another doctor and insisted on seeing a surgeon.  *Id.*  Dr. Hopson explained to Plaintiff that he had full function and range of motion, so she was not aware of any surgeon that would consider looking at a hand or finger in the good condition his hand was in.  *Id.*  She informed Plaintiff he should continue with hand squeezing exercises to strengthen his right hand.  *Id.*

According to the affidavit of Defendant Rice, she is a nurse employed at the UCDC.  She states she has never had a contract with Union County.  In addition, she testified she always followed the instructions of Dr. Hopson each time she wrapped Plaintiff's hand following his finger fracture.  (ECF No. 74-4, pp. 1-2).  She testified she was not the only nurse to change Plaintiff's wrap and she does not recall ever wrapping Plaintiff's hand (or anyone else's) into a fist.  Instead, she states she only remembers performing "buddy wraps" on Plaintiff.  *Id.*  On May 24, 2019, while Defendant Rice was cutting Plaintiff's hand wrap off, she "nicked his finger".  According to her sworn testimony, it was not a deep cut and it took her a second to find it because

it was such a small "nick".  Defendant Rice states the incident was unintentional.  (ECF No. 74-4, p. 2).

Defendant Rice further testified that referral to other physicians for x-rays or other imaging tests, for physical therapy, for surgery or casting, and/or the assignment of exercises, is entirely the physician's – not the nurse's – decision.  (ECF No. 74-4, p. 2).  She also states all of Plaintiff's requests were relayed to Dr. Hopson by her, but the decision was Dr. Hopson's to make, in her discretion.  She also testified she could not make those decisions, as they are beyond her scope of practice/licensure as a nurse in the State of Arkansas.  *Id.*  Defendant Rice also testified that each time Plaintiff requested to see Dr. Hopson, an appointment was promptly made for him.  *Id.*

Defendant Roberts is the Sheriff of Union County and as part of his many responsibilities he manages the UCDC.  (ECF No. 74-3, p. 1).  According to his affidavit, he does not recall ever speaking or interacting with Plaintiff in any way during his 2019-2020 incarceration at the UCDC - or any other time.  He also states he occasionally responds to complaints, grievances, and/or letters directed to him from detainees and/or their families or counsel and he did so in Plaintiff's case toward the end of his incarceration.   *Id.* at p. 2.

According to his affidavit, Defendant Roberts delegates responsibility for most day-to-day activities in the jail to subordinate officers through a chain of command.  Those officers are expected to perform those tasks pursuant to the policies he has implemented for the department.  This chain of command, in addition to other mechanisms like camera systems, post-incident investigations, and other mechanisms, also provides for the comprehensive supervision of the UCDC's employees.  (ECF No. 74-3, p. 1).  Defendant Roberts testified the UCDC's staff is trained under a comprehensive training system that meets or exceeds the requirement of state law.

8

This training includes jail standards training, medical and emergency response training, and training in the policies of the UCDC.  *Id.* at p. 2.  Defendant Roberts testified during Plaintiff's 2019-2020 incarceration, Union County had appropriate policies in place to address detainees' issues relating to Covid-19, medical procedures, disciplinary rights, grievances, use of force, and "Cell and/ or Pod Requirements".  *Id.* at pp. 42- 56.

According to the affidavit of Defendant Mitcham – the Jail Administrator for the UCDC, neither he nor anyone at the UCDC deleted or destroyed any of Plaintiff's grievances.  He states it is impossible because the grievances are stored on a secure off-site server at City TeleCoin – the vendor for the UCDC's kiosks and tablets.  (ECF No. 74-5, p. 6).  Defendant Mitcham testified he and the supervisory staff responded to Plaintiff's grievances and requests (as they did with all detainees) to correct or solve problems he reported.  (ECF No. 74-5, p. 2).

Defendant Mitcham also testified he never engaged in any abuse of Plaintiff – physical, mental, or otherwise – and never witnessed any of the UCDC staff engaging in any abuse.  (ECF No. 74-5, p. 7).  Defendant Mitcham testified neither he nor Defendant Pendleton or any other member of the UCDC staff or any Defendant ever "leaked" grievances, or the fact Plaintiff was filing grievances, to any of the other inmates nor did they "label" Plaintiff as an informant or "snitch".  (ECF No. 74-5, p. 1).  He also states Plaintiff's fight with another inmate named Moffett on April 2, 2020, involved the alleged stealing of each other's personal items, and had nothing to do with any inmates' belief that Plaintiff was filing grievances or was an informant.  Defendant Mitcham testified the argument between Plaintiff and Moffett was not made known to anyone on the UCDC staff until well after the fight occurred.  (ECF No. 74-5, p. 2).  Defendant Mitcham also testified he never called Plaintiff anything other than his name.  (ECF No. 74-5, p. 5).

Defendant Mitcham testified Plaintiff was placed in one of the one-man booking cells by himself for a short period of time because, when he left the UCDC and then returned, he had to go through quarantine with other incoming detainees pursuant to the UCDC's Covid-19 protocols. (ECF No. 74-5, p. 5).  In addition, Defendant Mitcham testified to his knowledge Plaintiff never contracted the virus.  He states the UCDC has only had two cases of Covid-19 since the beginning of the pandemic through the date of his affidavit – March 18, 2021.  *Id.* at pp. 5-6.  He goes on to state Defendant Roberts adopted and implemented robust policies to fight the spread of Covid-19 in the UCDC and these policies were put in effect early in the pandemic.  *Id.* at p. 7.  Defendant Mitcham testified Plaintiff was given a Covid-19 test at the UCDC, but the health unit courier damaged the vials.  When Plaintiff was asked to retake the Covid-19 test, he refused.  Plaintiff stated he only wanted a saliva test, but those tests were not available to the UCDC.  (ECF No. 74-5, p. 6).

According to Defendant Roberts affidavit, on April 30, 2020, several jail officers entered C Pod where Plaintiff was housed and told the inmates to rack up to their cells and get on their bunks because they needed to escort the nurse in to speak with one of the inmates.  Plaintiff refused to comply, despite repeated orders, until an officer approached and made him retreat to his bunk. (ECF No. 74-3, p. 35).  The video of the incident confirms no Defendant abused Plaintiff in any way during the cell-to-cell transfer on April 30, 2020.  (Video Filed Conventionally on April 5, 2021).

Defendant Cotton is a Sergeant at the UCDC.  According to his affidavit, Defendant Cotton was not involved with the medical care or Covid-19 allegations made by Plaintiff in his Amended Complaint.  (ECF No. 74-2, p. 1).  He also states he did not physically, mentally, or sexually abuse

10

Plaintiff.  *Id.* at p. 2.

Defendant Cotton testified on or about the morning of May 20, 2020, he reported to nursing to see if Plaintiff was finished cleaning himself up to the point where he could be seen by the nurse. (ECF No. 74-2, p. 2).  Defendant Cotton and two other officers (neither of which is a named Defendant in this lawsuit) went to the shower and found Plaintiff dressed in a uniform laying on a dry area of the shower room floor with a rolled up towel under his head.  *Id.*  Defendant Cotton states he began to ask Plaintiff if he was "ok" and asked what happened.  He states Plaintiff could not or would not respond and Defendant Cotton could not tell if he was experiencing an altered state of consciousness, was engaging in passive resistance (where an inmate goes limp and won't respond to frustrate the efforts of the staff), or if something else – or a combination of the two – was happening.  *Id.*

Defendant Cotton goes on to state he and one of the other officers stood Plaintiff up to evaluate him, by lifting under his armpits.  Standing him up took only a second or two and Defendant Cotton states he did not touch or grope Plaintiff's genitals, buttocks, or anything else at any time during the encounter, or at any other time.  (ECF No. 74-2, p. 2).  After lifting Plaintiff to his feet, Defendant Cotton states Plaintiff muttered something he couldn't make out, and they assisted him to the exam room in the nursing station which is only about 10 to 15 feet from the shower room.  Once in the exam room, one of the other officers and Defendant Cotton stayed with Plaintiff.  At that time, Defendant Cotton states Plaintiff laid on the floor in the exam room instead of getting in the wheelchair that was provided for him.  *Id.* at p. 3.  Defendant Cotton also testified the nurse then questioned Plaintiff about what was going on and he stated he had passed out.  *Id.* The video of the incident does not show any groping or anything else that could be construed as a

sexual assault or other abuse by Defendant Cotton.  (Video Filed Conventionally on April 5, 2021).

According to Defendant Mitcham's affidavit, on one occasion, Plaintiff complained about having commissary items stolen by a fellow inmate after he left several of them laid out on one of the picnic tables while he went into his cell.  Defendant Pendleton dealt with the problem, watching the video of the theft, but he couldn't identify the offending inmate (they all wear the same uniform, and they all know where the cameras are and avoid showing their faces when engaging in misconduct).  Defendant Pendleton explained this to Plaintiff and replaced the item taken with one from stock.  (ECF No. 74-5, p. 2).

Defendant Paul Kugler is a Lieutenant at the UCDC.  According to his affidavit, he was not involved with the medical care or Covid-19 allegations in Plaintiff's Amended Complaint. (ECF No. 74-6, p. 1).  He also testified he never abused Plaintiff in any way and certainly did not engage in any physical, mental, or sexual abuse of Plaintiff.  *Id.* at p. 2.  Defendant Kugler states he never called Plaintiff a "snitch" and never heard any other member of the UCDC's staff use any such labels toward Plaintiff.  (ECF No. 74-6, p. 2).

Defendant Kugler testified after Plaintiff and Moffett fought on April 2, 2019, both were administratively segregated until disciplinary hearings could be held.  (ECF No. 74-3, pp. 26). After the disciplinary hearing was conducted, Plaintiff was placed in disciplinary segregation.  He appealed that determination and Defendant Kugler handled the appeal.  Defendant Kugler was not involved in the matter prior to handling the appeal.  Defendant Kugler determined the jail's hearing policies were not followed and he spoke with Plaintiff at that time and released him from disciplinary segregation.  (ECF No. 74-6, p. 2).

12

**C. UCDC's Policies**

**1. Covid-19 Policies and Procedures**

On March 13, 2020, Defendant Roberts sent a notice to "All Law Enforcement Agencies in Union County" concerning the UCDC's procedures regarding Covid-19.  (ECF No. 74-1, p. 42). He states:

> With the recent concern regarding the spreading of the Coronavirus (COVID-19) we must take a proactive approach in keeping this virus from spreading, in and throughout, our detention facility.  We are currently screening each inmate for fever over 100 degrees, cough and shortness of breath, and other symptoms that may be related to the virus.  Should we encounter an inmate with these symptoms, we will place the inmate in isolation and begin treatment.
>
> However, we must also be proactive in the approach of accepting new arrestees coming into our facility.  This is where we need cooperation with your agency in helping us keep this virus from getting into our facility.  We have set up the following procedure with regard to arrestees entering the facility:  1) the officer and arrestee will be met at the sally port door prior to being allowed entry; 2) One of our staff will check the arrestee for fever and any signs of coughing or having problems with shortness of breath; 3) should the arrestee not have any of these symptoms then the arrestee will be allowed into the facility.
>
> If the arrestee has one of more of these symptoms, the arrestee will not be allowed to enter our facility until he/she has been medically cleared from a medical institution.  We respectfully request, that until the threat of the Coronavirus subsides, your officers use other alternative (i.e. citations to appear) for misdemeanor and nonviolent felony arrest instead of bringing said arrestees to our facility.  We apologize for any inconvenience this may cause your agency.  We feel these steps must be taken for the safety of those who are being housed in our facility.
>
> As soon as the threat of this virus spreading subsides, we will resume accepting inmates as we have before this potential breakout occurred.  Should you have any questions or concerns please contact me at…

*Id.*

On March 26, 2020, Defendant Roberts wrote a "MEMO" stating in part:

13

In response to the current Coronavirus Pandemic (COVID-19), the Union County Criminal Justice Facility [UCDC], has made the following changes to non-employee visits to better protect the safety of all persons while in this facility:

Attorney Visits – will be conducted through the glass in the old visitation room
Pastor Visits – will be conducted through the glass in the old visitation room
Investigator Interviews (Sheriff's Office & Police Department) – will be conducted through the glass in the old visitation room
Probation and parole Visits and Hearings – will be conducted through the glass in the old visitation room
DHS Visits – will be conducted through the glass in the old visitation room
Religious Programs – suspended
Hannah program Classes – suspended
SARHC Evaluations – will be conducted through TeleMed only (by pre-set appointment)
390 Visitation and Furloughs – suspended by order of Arkansas Department of Corrections
Doctor Call – will remain as normal on Monday
All visitations will return to normal rules and regulations once approved by the appropriate agencies.

(ECF No. 74-3, p. 43).

On April 6, 2020, Defendant Roberts sent out a memorandum to "All employees" regarding

Covid-19 which states:

According to the CDC the next two weeks are critical in the fight against COVID-19.  They are recommending those who must go out in public wear some type of mask covering your nose and mouth.

Over this past week many law enforcement officers around this country have contracted the virus and several have died from it.  Most contracted the virus from community contacts while preforming [sic] their duties.

Therefore, I **highly encourage** you to wear a mask when coming in contact with the general public.  We must do our part to keep ourselves safe from the virus.  Please wear some type of mask to protect yourself, your family and your law enforcement family.

It is my prayer this pandemic will be over soon and we can all get back to business as usual…

(ECF No. 74-3, p. 44).

That same day, Defendant Mitcham sent a "MEMO" to "All Jail Personnel" regarding "Masks/Face Covering" which states, "All Jail personnel have been issued masks/face covering. Effective immediately, these masks/face coverings are to be worn whenever you encounter a Detainee. This goes for during the Booking process, passing meal trays, passing commissary, passing State Issue and any other contact with Detainees. Signs have been posted around the Jail to remind you to have the mask/face covering on. (ECF No. 74-3, p. 45).

In addition, on April 6, 2020, Defendant Mitcham sent a "MEMO" to "All Jail Personnel" regarding Uniforms and Personal Property. (ECF No. 74-3, p. 46). The memo states:

> From this day forward until the COVID-19 threat is lifted, we will be following these set of guidelines pertaining to Employee Uniforms:
>
> - Wear street clothes and shoes to work
> - Bring two sets of uniforms (First Day Only)
> - Put a clean uniform on in the locker room (A locker has been assigned to each Employee)
> - At the end of shift, leave your uniform, with your name inside the waist band, and shoes inside your locker and change back into the street clothes your wore to work
> - Uniforms will then be washed and ironed each day and hung up in the Laundry Room
> - Repeat each day you work
>
> No backpacks or any other personal items will be brought inside the Jail. Any Backpacks, bags or other personal items can be left inside your locker.

*Id.*

On April 22, 2020, Defendant Roberts sent a letter to Jennifer Eley at the South Arkansas Regional Health Center, in El Dorado, Arkansas. The letter states:

> This letter is a follow up of our phone conversation we had this afternoon. As you are aware we have had to change the one-on-one contact with the inmates during this pandemic. With that said there are only two ways in which contact with

inmates can occur, (1) visitation through a glass divider using a phone to communicate, or (2) through the Telemedicine system we have in place.

Although we can accommodate you or your staff in either of these two ways, we would prefer the use the Telemedicine system for such screenings of our inmates. This can be accomplished by notifying our Nursing staff of a screening appointment and we will have the inmate available at the given date and time.  This will save SARHC staff time and will lower the number of individuals coming in contact with UCSO staff…

(ECF No. 74-3, p. 47).

On April 23, 2020, Defendant Roberts put in writing the following Covid-19 Emergency

Response Policy and Procedure for the UCDC:

- In the event a member of the UCSO Detention Facility should show signs and/or symptoms of the virus, the employee should immediately be sent home for a period of 14 days and may only return after he/she are symptom free (i.e. no signs of fever; not coughing)
- Should there become a shortage of Detention Officers on a shift that can't report for work, overtime will be authorized for officers filling in for shortage of staff.
- All Detention Officers **will** wear masks while at work.
- The mask must be worn covering both your nose and mouth.  Do not touch the front of the mask when removing the mask.  Cloth masks shall be washed daily.
- Wash or sanitize your hands prior to putting on gloves.  When removing gloves turn each glove inside out not touching the outside of the glove.  Dispose of them properly and wash or sanitize your hands.
- **WASH YOUR HANDS OFTEN!**
- Should an inmate show symptoms of COVID-19 immediately give the inmate a mask and isolate them from the rest of the general jail population.
- When dealing with an inmate with symptoms of the virus, staff shall dress out with full personal protection equipment before coming in contact with inmate.
- Detention Officers shall notify the nursing staff, and the jail administrator, as soon as possible when an inmate shows any symptoms of the virus.  Medical staff will notify the Department of Health and coordinate the testing process of the inmate.
- Medical staff:  co-pays for inmate's medical care for COVID-19 symptoms will be **waived.**
- All cells and pods shall be cleaned and disinfected at a minimum of three (3) times a week.  These practices shall be through using cleaning supplies which kills germs.

16

- Detention Officers are to log when cells and pods are cleaned noting the date and times and the supervisor who over seen the cleaning.

(ECF No. 74-3, p. 48).

### 2.  UCDC Detainee Medical Procedures

The UCDC also has detainee medical procedures in place.  (ECF No. 74-3, p. 50).  The

relevant portions of this procedure include the following:

- Doctor visits are one time a week.
- It is mandatory for sick call request forms be filled out completely prior to seeing a doctor or nurse. (Do not use grievances)
- No Detainees shall be denied necessary health care because of inability to pay.
- All sick call request forms should be turned in by 0800 to be seen by Nurse or Doctor.  This does not apply to emergency situations.
- Pill call will be at 9:30 am AND 6:00PM (+ OR -) 1 hour.  Detainees are required to walk to the food ports, receive medication, and swallow it in the view of the issuing officer.  No hoarding of medication is allowed.  Detainee will initial MARS sheet in the appropriate box.
- Emergency issues:  No Detainee will be refused medical screening.
- Violations of this policy may result in disciplinary action under UCSO disciplinary rules for Detainees.

*Id.*

### 3.  UCDC Detainee Disciplinary Rights

The UCDC also has procedures in place to inform detainees of their rights in connection

with any disciplinary hearing.  (ECF No. 74-3, p. 51).  The policy provides before a hearing

can begin, an accused detainee "must acknowledge that they are familiar with their rights"

which include the following:

- The right to present evidence and witnesses on their behalf and to request cross examination of the accuser, provided such requests are relevant, not repetitious, not unduly burdensome to the facility, or unduly hazardous to staff or detainee safety.  The hearing office has the option of stipulation expected testimony from witnesses.  The accusing employee must be

17

summoned when the report is based solely on information from confidential informants.
- The right to not be compelled to incriminate himself/herself.
- The right to a written summary of the evidence and reasons for the judgement, including reasons for the sentence imposed, when the accused plead not guilty and was found guilty.
- The right to appeal.
- The right to a hearing 72 hours after placement in administrative segregation, official holidays, weekends, genuine emergencies, or good faith efforts by the administration to provide a timely hearing are the only exceptions.
- The right to an unbiased hearing. Any hearing officer directly involved in the incident, who is biased for or against the accused.
- The right to be given a written copy of the disciplinary report at least 24 hours before the hearing begins which describes the charges against the detainee (unless waived by him/her).

*Id.*

### 4.  UCDC Grievance Procedure

The purpose of the grievance policy at the UCDC is to establish a procedure through which a detainee may seek formal review of a complaint which relates to any aspect of his detention if less formal procedures have not resolved the matter. (ECF No. 74-3, p. 52). The procedure states:

All detainees housed within the confines of the Union County Sheriff's Office Detention Center may request a grievance to situation arising from policies, conditions, or events within the jail. All detainees, regardless of their impairment, or handicap, shall be entitled to invoke this grievance procedure.

Detainees should always try to resolve their problems within the jail informally, before initiating the grievance process. This informal resolution may be by talking to any staff member. If a detainee is unable to resolve his/her problems or obtain relief in this fashion, he/she may initiate the formal process.

If a grievance is unclear or the volume of attached material is too great, it may be rejected and returned to the detainee with a request for clarity o r summarization on one additional page.

Reprisals: No action shall be taken against anyone for the good faith use of or good faith participation in the grievance procedure.

The prohibition against reprisals should not be construed to prohibit discipline of detainees who do not use the system in good faith.  Those who file grievances that are frivolous or deliberately malicious may be disciplined under the appropriate rule violation described in the UCSO disciplinary rules for detainees.

*Id.*

### 5.  UCDC Cell and Pod Policy

The UCDC also has the following cell and pod requirements in place which are provided to all detainees:

- Pods will be issued cleaning supplies no less than 5 days per week.  All cleaning supplies will be returned, hoarding spray bottles, brushes, or any type of cleaner will be a violation of this policy.
- Cells and day rooms will be clean and free from clutter. Each detainee is responsible for his/her assigned cell.
- Clothes lines are prohibited.
- Lights and windows shall be free from coverings.
- The hoarding of unauthorized items is prohibited.
- The construction of or possession of hobbycraft and items not being used for the purpose for which they were intended is prohibited.
- Detainees will be dressed in jail uniforms in all pod day rooms during the hours of 0800 to 2230. (Lights on) during prevailing circumstances (laundry) (walking to or from shower) detainees will be covered.
- Misdemeanor Pod (O-Pod) will be fully dressed in jail uniforms during entire lights on period / or covered in bunk. (0800 to 2230)
- Detainees in Misdemeanor Pod ((-Pod) shall not cluster around windows nor beat or tap on glass.
- Detainees shall not misuse housing intercoms, emergency, or applicable information only.  (Do not interfere with 911 or Sheriff Office Operations)
- All detainees shall be clothed or covered while at food ports.
- Detainees are only allowed in cells to which they are assigned.
- Behavior that is loud, disruptive, or causes a disturbance is prohibited.
- Detainees using the kiosk during visitation shall be free from disturbing noise and behavior. (Near or background)
- Violation of this policy will result in disciplinary action under UCSO disciplinary rules for detainees.

(ECF No. 74-3, p. 53).

### 6.   UCDC Use of Force Policy

The UCDC also has an extensive policy governing the use of force employed by their officers.  (ECF No. 74-3, p. 55-56).  The policy establishes the types and degrees of force which may be used to overcome a level of resistance, to control persons who are in custody and/or to prevent escape and to accomplish lawful objectives.  The policy clearly states UCDC employees will only use the type and degree of force which is reasonable and necessary based on the circumstances.  The policy includes the following Use of Force Continuum:

- Level 1 – Command Presence – An officer's presence and identification of authority.
- Level 2 – Verbal direction – Verbal Directions or voice commands.
- Level 3 – Aerosol spray weapons that contain OC or OC/CS, including the JPX 450.
- Level 4 – Soft Hand Techniques: Takedown and/or Control Techniques; and Electronic Control Devices (TASER).
- Level 5 – Intermediate Weapons – SIM's; Expandable ASP Baton; Riot-Baton; Flashlight; and hand deployed specialty impact munitions may be used on non-lethal areas of the body.
- Level 6 – Deadly Force – Use of Firearms or other weapons in a reasonable manner and in accordance with Department policy and state law.

*Id.*  The policy states employees shall escalate or de-escalate their use of force in direct response to the other person's actions.  They are also discouraged from using vascular neck restraints or similar weaponless control techniques which have a potential for serious injury.

### D. Plaintiff's Deposition Testimony

On November 20, 2020, Plaintiff testified under oath at his deposition.  (ECF No. 74-1, pp. 1-222).  Plaintiff states he submitted approximately two-hundred twenty-nine (229) grievances using the UCDC's kiosk or tablets during his incarceration at the UCDC in 2019 and 2020.  *Id.* at p. 17.  He alleges Defendant Mitcham "would sometimes suspend the grievances, suspend the ability to write them…"  *Id.*  He states towards the end of his time at the UCDC, "all of the responses were resolved without an appeal even though they were not resolved, and I did in fact

20

appeal them."  *Id.* at p. 18.  Plaintiff acknowledged he sometimes would get other inmates to help him "count" responses to his grievances.  *Id.* at p. 19.  He also states while he was in the medical unit, he was only permitted to submit grievances on paper.  *Id.* at 20.

Plaintiff says he wrote a grievance asking for the cameras to be reviewed after another inmate stole some food items from him and Defendant Pendleton told him, "That it is my fault, essentially, or something along that lines."  (ECF No. 74-1, p. 27).  Plaintiff goes on to say Defendant Pendleton "…did nothing to tell the person to give the items back…later came into the pod in front of other inmates while I am there and kind of reprimanded me for writing a grievance, essentially, I think the jail jargon is a snitch…told me to stop writing grievances…"  *Id.*  Plaintiff states after Defendant Pendleton told inmates he was writing grievances against them, he was attacked by inmate Moffett.  *Id.* at p. 28.  Plaintiff does acknowledge Defendant Pendleton brought him another item of food "as a sort of way to compensate" for what was taken from me.  *Id.* at p. 29.

Plaintiff testified after the guards found out about his fight with his cellmate Moffett, they put both in isolation.  "They then – they attempt to conduct some type of disciplinary hearing, although they violated their own policy.  And the verdict imposed by the pseudo court in which they had was overturned.  They violated many of their own policies, and Lieutenant Kugler later came in and apologized for their poor handling of the quasi court …"  (ECF No. 74-1, pp. 34-35).

Plaintiff also testified right before the altercation with Moffett, Moffett made "… hectoring threats.  I know he brought up the grievances and about what I was writing and the information divulged to him by Pendleton, and then he just – swung on me."  (ECF No. 74-1, p. 36).

Plaintiff testified when Defendant Mitcham would answer some of his grievances "he

would somehow leak the information to everyone of the staff, all the employees." (ECF No. 74-1, p. 39).

Plaintiff states Defendant Rice "had a tendency to harass me and just single me out. She claims I am violating some rule, which is later shown to not exist in the policy. But she accuses me of standing or existing." (ECF No. 74-1, p. 41).

Plaintiff testified Defendant Cotton touched and "groped" him in the shower on one occasion. (ECF No. 74-1, p. 44). He also states Defendant Cotton took pictures of him, watched him, "moved [his] finger across [his] neck horizontally as to indicate some type of death threat", and called him all types of homophobic slurs. (ECF No. 74-1, p. 45).

Plaintiff testified Defendant Pendleton gave him a "quasi-disciplinary hearing in which he manages to violate almost all of their policies, rules. He does not allow me to call witnesses…question the nurse…present certain evidence…question the officer which accused me…" (ECF No. 74-1, p. 46). "So Pendleton then gives me the guilty verdict of a month of solitary confinement, suspends all of my commissary, suspends my privileges…" for not doing what Defendant Rice told him to do. *Id.* at 47. After this Plaintiff states he went on a hunger strike. *Id.* at p. 49.

Plaintiff testified he was taken to the shower after vomiting and having diarrhea and he turns on the water and tries to shower. (ECF No. 74-1, p. 55). "I eventually sat down in the corner [after the shower], because everything was just flashing, and I lay down, and I lost consciousness…I remember being awakened by the voice of Jebediah Cotton…he is commanding me to do something…he then starts grabbing me, touching me…I feel both hands just groping my buttocks region, my genital region. He is pulling me up." *Id.* at p. 56. "Then he drags me – I am

22

later told this by other guards, which gave me an account of what happened, because I was only semi-conscious during all of this…I did have clothes on…I was just drug down the hallway until I got in to the medical room." *Id.* My "uniform just ripping onto my genital regions, because I am just being gripped from the back as if to cause an extreme wedgie…" *Id.* Plaintiff also states when he was being lifted by Cotton and another guard, his eyes were not open "if they were it was hazy. The event itself is a nebulous occurrence. I got most of the information from the guards and then from the video camera to know exactly what happened." (ECF No. 74-1, p. 156).

Plaintiff testified an inmate named McDonald kept threatening him, would take Plaintiff's things and "he would mention that he heard what Mitcham told him about me. He heard how I am the guy that snitches on people and writes grievances, and he just kept mentioning all the things Mitcham had told him and what other guards had told him." (ECF No. 74-1, p. 59). He states McDonald pushed him down on the bed on one occasion. *Id.*

Plaintiff states the "retaliation" against him worsened after he filed this lawsuit. (ECF No. 74-1, p. 62).

Plaintiff testified Defendant Cotton mentally abused him when he "threatened to deprive me of all of my rights based on arbitrary rules in which he is making up on the spot…taking pictures of me, fondling my socks, my undergarments." (ECF No. 74-1, pp. 73-74). Plaintiff states when he asked for an explanation of this Defendant Cotton stated, "these things are blocking the camera". *Id.* at p. 74.

Plaintiff testified "the actual reason as told by many of the other guards is that Mitcham wants to isolate me. He wants to keep me from other inmates, and he wants to put me around dangerous inmates so that I could be hurt…" (ECF No. 74-1, p. 77).

23

After his time in O Pod, Plaintiff testified Defendant Mitcham "put me in the hole…He kept me there for two weeks because I complained."  (ECF No. 74-1, p. 81).  Plaintiff goes on to state Defendant Mitcham's justification for this move was "Well, Covid says we have to have you in here for two weeks even though I wasn't around anyone that had Covid."  *Id.*

Plaintiff testified "there would be times in which I would send things [mail] out, and they would never be sent.  Pendleton was the one which I handed them to.  And so I would never get mail back from – or I would never get confirmation that the person I sent the mail had received the mail.  And so I don't know what factors transpired after I handed the mail to him."  (ECF No. 74-1, p. 83).  When asked if there were any mail items sent to him that were not either scanned into the system or put in his property, Plaintiff states, "I only know of the kind of braggadocious remarks that I received from certain officers.  I even had officers…tell me how guards like Pendleton would get mail and laugh or withhold the mail."  (ECF No. 74-1, pp. 84-85).  He states his mother told him she had sent him mail and he never received it.  In addition, Plaintiff states mail supposedly sent by a lawyer – not Plaintiff's attorney – was never received by him.  *Id.* at p. 85.  He also states he sent mail out to his federal criminal lawyers that they said they never received.  *Id.* at 86.  Plaintiff did acknowledge that the United States Postal Service is not "infallible".  *Id.* at p. 87.

Plaintiff testified after his hand was injured in the altercation with Moffett, all the nurses did was wrap it.  (ECF No. 74-1, p. 97).  He also states, "I believe the nurse realized she was not following the doctor's orders and had been…wrapping my finger the wrong way, and so they started wrapping it a different way.  *Id.* at p. 95.  He also testified whenever the nurses would wrap his hand they would use tape and cotton, then leave it for a week, all the while he was taking

showers and his hand was getting wet. *Id.* He states he was telling guards, "Hey, I am pretty sure fungus growing on this is not probably up to standard medical treatment…they would just disregard that…[and] say, we will tell the nurse. The nurse says she will get to it when she can." *Id.*

Plaintiff states Defendant Rice came close to lacerating his skin with scissors when she was removing his wrap. (ECF No. 74-1, p. 98). He states he asked her to remove the wrap the way the other nurse did because it was less painful and safer. Plaintiff testified "so she keeps using the scissor method until one day she is, I think, intentionally being careless, because this – within the first few days of me – or you can tell she is not an amicable type of person, at least, she particularly pretended to no like me." *Id.* at p. 99. "For whatever reason, she buries the scissors into my right finger cutting deep into my skin, nearly hitting bone." He states he believes the officer with him turned off his body camera and they quickly tried to clean up the blood. *Id.* at p. 100.

As for Plaintiff's claims that Defendants Roberts, Mitcham, Pendlton, Kugler, and Cotton placed him in solitary confinement for twenty (20) days without justification, Plaintiff testified this was not the incident he previously referred to which occurred after his fight with inmate Moffett. (ECF No. 74-1, p. 103). Instead, he states this was another incident where they put him in solitary confinement based on Defendant Rice's accusation "for my crime of standing". *Id.* Plaintiff acknowledged the instruction given to him by Defendant Rice was to "rack up". (ECF No. 74-1, p. 105).

When asked if he was placed in solitary confinement for 20 days following the hearing for disobeying the order to rack up, Plaintiff states "No. My appeal listed two – there was two main

problems in my appeal: one, it took a linguistic angle that an order can't be followed if the words can't be understood, and, also their esoteric terms weren't some type of explanation….during my hearing…I even called in witnesses…I was being placed there because I had a lawsuit harassment." *Id.* p. 112.  When asked what he was told as the reason he was being placed in segregation, he testified "…I think it was something like defiance". *Id.*  Plaintiff also stated "…there was no justification, because it is not a rule.  That rule does not exist.  It is made up…" *Id.*

When asked to explain his claim that Defendants Roberts, Mitcham, Pendleton, Kugler, and Cotton "placed Plaintiff in the intake pod which is used to quarantine new inmates to determine if they have COVID-19 virus", Plaintiff testified Defendants put him in the pod with all the new people from the streets …who are not being tested, who are not being screened for COVID and them placing them in my immediate proximity without any type of remedies or address to what social distancing…the face mask, which we weren't provided, hand sanitizers. So I think being exposed to a deadly pandemic is a – got to be some type of a violation."  (ECF No. 74-1, p. 113). Plaintiff testified he was tested for Covid once, but the "test didn't work".  Plaintiff also stated he had never tested positive for Covid-19.  *Id.* at p. 114.

When asked if he had any knowledge of anyone in the intake pod with him who was Covid-19 positive, Plaintiff replied, "One person told me that, yes, they had the COVID and asked to be tested, and the jail would not test them."  (ECF No. 74-1, pp. 115-116).  When he was asked who that person was, "I don't' know these people's names.  I have them written in grievances."  *Id.* at p. 116.

When asked how Defendants retaliated against him for filing grievances Plaintiff replied,

"…By placing me in solitary confinement, by denying my access to the phones, withholding my mail, threatening me verbally, threatening me through grievances, being subjected to harsher treatment, being the victim of a spontaneous rule creation…being harassed on a daily basis…having responses given to me, like, I hope he dies in prison or I hope he stays here for another 2006 years by Sherie Rice." (ECF No. 74-1, pp. 125-126).  "…And each grievance seemed to bring about a more heat from the officers in which I grieved about."  *Id.* at p. 126.  Plaintiff testified he continued to file grievance after grievance even though several Defendants refused to act on them and retaliated against him for filing the grievances because he wanted to "document the abuse".  (ECF No. 74-1, p. 131).

Plaintiff testified he believes Defendant Mitcham did not send his grievances on to the Sheriff – Defendant Roberts.  (ECF No. 74-1, p. 137).  He also states he does not know whether his grievances were forwarded to Defendants Roberts, Pendleton, or Kugler.  *Id.* at pp. 137-138.

Plaintiff testified he has three primary complaints about Defendant Rice.  (ECF No. 74-1, p. 143).  He states "she just refuses to allow me to see any chiropractor or even get x-rays or have an MRI" for his lower back, refused to let him see a physical therapist about restoring mobility to his hand, and did not allow him to have "some type of reconstructive surgery on my hand…or maybe a cast to be put on…"  *Id.*  Plaintiff goes on to state Dr. Hopson told him she didn't believe the treatments or his requests were necessary.  *Id.* at p. 144.

Plaintiff testified after his fight with inmate Moffett he was placed in solitary "greater than a week, but less than two weeks.  Because I was pulled out by Lieutenant Kugler, which told me very apologetically and very kindly, I should add, that they made a genuine mistake that I was not supposed to be in solitary, certainly not for defending myself."  He went on to state Defendant

Kugler "nullified my sentence, and he allowed me to go back in population". (ECF No. 74-1, p. 207).

Plaintiff testified that the UCDC's "sick bay is just another solitary confinement closer to the nurse." (ECF No. 74-1, p. 208).

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In addition, "Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights.   To establish personal liability on the part of a defendant, [the plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of [his] constitutional rights."   *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (citation and internal quotation marks omitted).

Moreover, a party may not rely solely on inadmissible hearsay in opposing a motion for summary judgment.   *Brewster v. U.S.,* 860 F. Supp. 1377 (S.D. Iowa 1994).   The Eighth Circuit has repeatedly held that a plaintiff's own self-serving statements are insufficient to defeat a properly supported motion for summary judgment.   *Bacon v. Hennepin County Med. Ctr.,* 550 F.3d 711, 716 (8th Cir. 2008); *Gipson v. Dassault Falcon Jet Corp.,* 983 F.3d 377, 382 (8th Cir. 2020).

## III. DISCUSSION

### A.  Defendants Perry and Ward

As an initial matter, neither Defendant Perry nor Ward were ever served with process in this lawsuit.   Accordingly, I recommend they be terminated as Defendants and Plaintiff's claims against them be dismissed without prejudice.

### B.  Count I – Medical Need

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs during his incarceration in the UCDC during 2019 and 2020.   Plaintiff was a pretrial detainee at the time his claims arose and therefore his claims are analyzed under the Fourteenth Amendment's Due Process Clause.   *Bell v. Wolfish*, 441 U.S. 520 (1979).   The Eighth Circuit has held under the Fourteenth Amendment, pretrial detainees are entitled to at least as great protection as that afforded

to convicted prisoners under the Eighth Amendment.  *Owens v. Scott Cnty Jail*, 328 F.3d 1026, 1027 (8th Cir. 2003) (per curiam).  The Eighth Amendment prohibition of cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners.  *Luckert v. Dodge Cnty.*, 684 F.3d 808, 817 (8th Cir. 2012).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  "[T]he failure to treat a medical condition does not constitute punishment within the meaning of the Eighth Amendment unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge."  *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).  "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment."  *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Long*, 86 F.3d at 765).

The deliberate indifference standard includes "both an objective and a subjective component: 'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'"  *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany,* 132 F.3d at 1239).  To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted).  To establish the

subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services,* 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

Here Plaintiff was diagnosed by a physician as having a fracture of his right index finger and therefore, his injury is a serious medical condition.  Accordingly, the only issue is whether Defendants were deliberately indifferent to Plaintiff's injured hand.

**1.  Defendants Roberts, Mitcham, Pendleton, Kugler and Cotton**

First, Plaintiff's allegation that Defendants Roberts, Mitcham, Pendleton, Kugler and Cotton "ignored" his requests for medical treatment of his hand for a week after he injured his hand in a fight with another inmate is not supported by the summary judgment record.  Other than his conclusory allegation, Plaintiff has not provided any summary judgment evidence that any of these Defendants were involved in his medical care, interfered with his ability to receive care, or delayed medical care in any way.  When asked in his deposition how these Defendants ignored his requests, Plaintiff responded by admitting he was taken to the hospital the day after he fractured his finger where an x-ray was performed.  (ECF No. 74-1, pp. 94-95).  Accordingly, I recommend Defendants Roberts, Mitcham, Pendleton, Kugler, and Cotton be granted summary judgment on Plaintiff's claims they denied him medical care.

**2.  Defendant Rice**

Plaintiff alleges Defendant Rice denied him medical care when she:  1) initially improperly wrapped Plaintiff's injured hand and did not check on the status of the injury while Plaintiff was in solitary confinement; 2) refused to provide necessary medical treatment to Plaintiff; 3) refused

to place Plaintiff's hand in a cast, allow Plaintiff to see a specialist, or provide any follow-up therapy; and 4) refused to follow the proper sanitary protocol when she changed the wrap on Plaintiff's hand.

Plaintiff's allegations against Defendant Rice do not rise to the level of deliberate indifferent.  Courts "hesitate to find an [E]ighth [A]mendment violation when a prison inmate has received medical care."  *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990).  Here, the summary judgment record contains approximately 43 pages of medical records documenting Plaintiff's medical care and treatment during his time in the UCDC in 2019 and 2020.  In addition, Defendant Rice states in an affidavit that she followed Dr. Hopson's instructions in wrapping Plaintiff's hand and she did not intentionally injure Plaintiff's finger when she was cutting off the wrap.  (ECF No. 74-4, p. 2).  Moreover, she testified she could not make any decisions related to whether Plaintiff received various medical treatments including surgery or casts on his hand.  *Id.*

Although Plaintiff disputes the adequacy of his medical care from Defendant Rice, he has not provided any summary judgment evidence which gives rise to a genuine issue of fact.  *See Delaney*, 132 F.3d at 1240 (holding in the face of medical records indicating treatment was provided and physician affidavits indicating treatment was adequate, a plaintiff may not create a question of fact simply by alleging he did not feel the treatment was adequate.) The Eighth Circuit has "repeatedly held that a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail to rise to the level of a constitutional violation." *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990) (prisoner's disagreements on location of rehabilitation for burn injuries, amounts of pain medication, and frequency of bandage changes failed to state deliberate indifference).

Finally, Plaintiff testified during his deposition that Defendant Rice "intentionally being careless…buries the scissors into my right finger cutting deep into my skin, nearly hitting the bone."  (ECF No. 74-1, p. 99).  First, Defendant Rice submitted an affidavit stating she did not intend to cut Plaintiff's finger.  Second, Plaintiff describes her actions as "careless", which is the textbook definition of negligence which, as previously stated, is not actionable under §1983.  In addition, there are no medical records to show the wound ever became infected or interfered with the healing of his fractured finger due to her alleged refusal to follow the proper sanitary protocol when she changed the wrap on Plaintiff's hand.

Accordingly, I recommend Defendant Rice be granted summary judgment on Plaintiff's claims she denied him adequate medical care.

### C.  Count II – Inmate Abuse

In Count II, Plaintiff generally alleges Defendants Roberts, Mitcham, Pendleton, Kugler, Cotton and Rice subjected him to physical, mental, and sexual abuse in violation of Plaintiff's constitutional rights.  The allegations include verbal/mental abuse, refusal to act or respond to grievances, unjustified discipline and punishment, physical abuse, sexual abuse, interference with mail, retaliation for filing grievances, and failing to take action against another inmate who stole some of Plaintiff's possessions.

#### 1.  Verbal/Mental Abuse

Plaintiff alleges Defendants verbally abused and harassed him on several occasions.  The law is clear, "verbal threats do not constitute a constitutional violation."  *Martin v. Sargent*, 780 F.2d 1334, 1339 (8th Cir. 1985).  Similarly, taunts, name calling, and the use of offensive language does not state a claim of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir.

1993) (inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8ᵗʰ Cir. 1987) (verbal threats and abuse by jail official did not rise to the level of a constitutional violation).

Accordingly, the Court recommends Defendants be granted summary judgment on all of Plaintiff's claims based on verbal and mental abuse or harassment.

### 2. Refusal to act or respond to grievances

Plaintiff alleges his constitutional rights were violated when Defendants ignored or refused to respond to his grievances about jail conditions. The law is clear that inmates do not have a constitutionally protected right to a grievance procedure. *Lomholt v. Holder*, 287 F.3d 683, 684 (8ᵗʰ Cir. 2002) (citing *Buckley v. Barlow*, 997 F.2d 494, 495 (8ᵗʰ Cir. 1993)). Therefore, a prison official's failure to respond to or process an inmate's grievances, without more, is not actionable under § 1983. *Id.* Accordingly, Plaintiff's claims relating to Defendants' responses, or lack thereof, to his grievances fail as a matter of law. Accordingly, I recommend Defendants be granted summary judgment on this claim.

### 3. Unjustified discipline and punishment

Plaintiff alleges Defendants Roberts, Mitcham Pendleton, Kugler and Cotton placed Plaintiff in the "hole" without justification for instigating a fight when Plaintiff was attacked by another inmate. Plaintiff also claims on another occasion he was placed in solitary confinement for twenty (20) days without justification after he was falsely charged with "defiance". He also alleges Defendants failed to follow their own procedures when conducting a hearing in connection with one of the charges.

Plaintiff's claims that Defendants filed false or unjustified charges against him fails to state a constitutional claim.  *See Daniels v. Ferguson*, 2008 WL 698485, *9 (W.D. Ark. March 13, 2008) ("To the extent Daniels contends his Due Process rights were violated because the disciplinary charges were fabricated or the events simply never occurred, courts have held that a prisoner enjoys no constitutional guarantee to be free from false charges that may lead to punishment.") (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2nd Cir. 1986) and *Glick v. Sargent*, 696 F.2d 413, 414 (8th Cir. 1983).[4]  In addition, the law is clear that "an internal jail policy or procedure does not create a constitutional right, nor does a correctional officer's failure to follow such regulation rise to the level of a § 1983 claim."  *Brown v. Boone Cnty.,* No. 5:13-cv-03065-TLB, 2014 WL 4405433, at *5 (W.D. ark. Sept. 5, 2014) (citing *Kennedy v. Blankenship,* 100 F.3d 640, 643 (8th Cir. 1996)).

Accordingly, the Court recommends Defendants be granted summary judgment on Plaintiff's claims he was unjustifiably placed in segregation based on false charges.

### 4.  Physical and Sexual Abuse

Plaintiff alleges Defendant Cotton subjected him to physical and sexual abuse when he was dragged from the shower area to the medical unit on one occasion after he passed out.  Under the 8th Amendment, prison officials are prohibited from using excessive physical force against prisoners. *Farmer v. Brennan,* 511 U.S. 825 (1994); *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). In addition, sexual abuse or harassment of an inmate can violate the Eighth Amendment if the alleged abuse or harassment caused "pain" and, "as a subjective matter, . . . the prison official in

---

[4] The Court notes Plaintiff did not make any allegations in the Amended Complaint concerning a violation of his due process rights or any conditions of confinement during the time he was placed in segregation.

question acted with a sufficiently culpable state of mind." *See Berry v. Oswalt*, 143 F.3d 1127, 1131-33 (8th Cir. 1998) (repeated non-routine pat-downs and subsequent rape of female inmate by male prison guard violated Eighth Amendment).

Here, there is no admissible summary judgment evidence to support Plaintiff allegations that Defendant Cotton abused him physically or sexually.  Plaintiff admits in his deposition he "lost consciousness", but felt "hands just groping my buttocks region, my genital region.  He is pulling me up. Then he drags me…"  (ECF No. 74-1, p. 156).  Plaintiff then states, I am later told this by other guards, which gave me an account of what happened, because I was only semi-conscious during all of this…I did have clothes on…my uniform just ripping onto my genital region…to cause an extreme wedgie…I got most of this from the guards and then from the video camera to know exactly what happened." *Id.*   As previously stated, what the other guards allegedly told Plaintiff is inadmissible hearsay.   In addition, Defendant Cotton submitted an affidavit stating he never physically or sexually abused Plaintiff and the video footage confirms his verified statements.

Accordingly, the Court recommends Defendant Cotton be granted summary judgment on Plaintiff's claims of physical and sexual abuse.

### 5. Interference with mail

Plaintiff alleges Defendant Pendleton "withheld mail directed to Plaintiff".  (ECF No. 60, p. 3).  In his deposition, Plaintiff described the mail as correspondence with his mother and an attorney who was not representing him.  Plaintiff's claim based on alleged interference with his mail fails as a matter of law for two reasons.  First, Plaintiff's only testimony to support this claim

is based on hearsay statements from unidentified inmates and his mother.  As previously stated, such statements are not admissible to create an issue of fact on summary judgment.

Second, even if there was evidence Defendant Pendleton interfered with the mail described by Plaintiff, his claim would still fail.  It is settled law that "privileged prisoner mail, that is mail to and from an inmate's attorney and identified as such, may not be opened for inspections for contraband except in the presence of the prisoner."  *Beaulieu v. Ludeman,* 690 F.3d 1017, 1037 (8th Cir. 2012).  Here, Plaintiff does not claim Defendant Pendleton opened or interfered with his "privileged" legal mail.  Accordingly, the Court recommends Defendant Pendleton be granted summary judgment on Plaintiff's claim that he interfered with his mail.

### 6.  Retaliation

Plaintiff alleges Defendants Mitcham, Pendleton, Kugler, and Cotton retaliated against him for filing multiple grievances by labelling him as a "snitch" or "informant", telling inmates Plaintiff was filing grievances, and encouraging inmates to retaliate against him.

The filing of a prison grievance, like the filing of an inmate lawsuit, is protected First Amendment activity.  *Dixon v. Brown*, 38 F.3d 379 (8th Cir. 1994).  In general, "[c]onduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason."  *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001) (citing *Madewell v. Roberts*, 909 F.2d 1203, 1206 (8th Cir. 1990)).  The retaliatory conduct itself need not be a constitutional violation in order to be actionable.  Additionally, there is no independent injury requirement when retaliatory conduct is involved.  *See Dixon*, 38 F.3d at 380.

To prevail on his retaliation claim, Plaintiff must demonstrate: (1) he engaged in protected activity; (2) Defendants responded with adverse action that would "'chill a person of ordinary firmness' from continuing in the activity;" and (3) the adverse action was motivated at least in part by exercise of the protected action. *See L.L. Nelson Enterprise Inc. v. County of St. Louis, Mo.,* 673 F.3d 799, 807-8 (8th Cir. 2012) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)).

First, there is no question Plaintiff engaged in a protected activity when he submitted medical requests and grievances. However, as to the second part of this analysis, the fact Plaintiff continued to file over a hundred grievances (229 in total) after Defendants allegedly retaliated against him demonstrates their conduct did not "chill" Plaintiff from continuing in the protected activity. In addition, Plaintiff has not presented any admissible summary judgment evidence to support his actual retaliation claims. *See Meuir v. Greene County Jail Emples.,* 487 F.3d 1115, 1119 (8th Cir. 2007) ("Merely alleging that an act was retaliatory is insufficient."). Instead, Plaintiff again relies on hearsay statements from inmates to support his claim.

Considering the summary judgment record, Plaintiff has failed to establish he actually suffered any adverse action. *See Murphy v. Mo. Dept. of Corr.,* 769 F.2d 502, 503 n. 1 (8th Cir. 1985) (holding an inmate bears a heavy evidentiary burden in establishing a prima facie retaliation case). Accordingly, Plaintiff's claims for retaliation fail as a matter of law and the Court recommends Defendants be granted summary.

### 7.  Failure to take action against inmate who stole Plaintiff's property

Plaintiff alleges Defendants Mitcham, Pendleton, and Kugler refused to take action against an inmate for stealing Plaintiff's property "or any action to stop said stealing". This claim is without merit.

The law is clear that victims of a crime lack any legal right to compel criminal prosecution or institute criminal prosecution.  *See Hurst v. Hurst*, No. 5:14-cv-05270-TLB, 2014 WL 5018827, at *2 (W.D. Ark. September 17, 2014), citing *Diamond v. Charles*, 476 U.S. 54, 64-65 (1986); *Frison v. Zebro*, 339 F.3d 994, 998-1000 (8th Cir 2003 (rejecting a § 1983 claim based on the violation of a criminal statute; *In re Kaminski*, 960 F.2d 1062, 1064 (D.C. Cir. 1992) (private party lacks judicially cognizable interest in prosecution of another person).  In addition, there is no constitutional right to have law enforcement officials investigate a reported crime.  *See Sheets v. Mullins*, 287 F.3d 581 (6th Cir. 2002) (no due process or equal protection violation by sheriff's department sergeant in responding to a call reporting domestic violence).

Moreover, the summary judgment record shows neither Defendant Mitcham nor Kugler were involved in the incident where an inmate stole some of Plaintiff's commissary items.  Instead, Defendant Pendleton attempted to identify the inmate who took the items but was unable to do so and he replaced the item that was stolen with something similar from the commissary stock. Accordingly, the Court recommends Defendants Mitcham, Pendleton and Kugler be granted summary judgment based on their alleged failure to prevent or take action against another inmate for stealing Plaintiff's property.

### D.  Count III – Failure to Follow Covid-19 Directives

In Count III, Plaintiff generally alleges Defendants violated his constitutional rights when they failed to follow the directive issued by the Arkansas Department of Health on April 15, 2020, to reduce the spread of Covid-19 in prisons.

First, there is no summary judgment evidence indicating any Defendant other than Defendant Roberts had any responsibility, control, or personal involvement in how the UCDC

responded to the Arkansas Department of Health's directive.  Second, the summary judgment record demonstrates Defendant Roberts began implementing policies and protocols in March of 2020 – before the Arkansas Department of Health even issued its directive - to protect not only the UCDC's detainees but also the staff in response to the threat of the Covid-19 virus. Moreover, all the video submitted by Defendants shows officers wearing masks and gloves.

Finally, the summary judgment record confirms Plaintiff never tested positive for Covid-19 and he was placed in a one-man booking cell (by himself) for a short period because after he was transferred out of the UCDC, he had to go through quarantine with other incoming detainees in accordance with the UCDC's Covid protocols.  Finally, the only two confirmed cases of Covid-19 in the UCDC occurred when Plaintiff was not incarcerated there.  (ECF No. 74-5, pp. 5-6).

Accordingly, the Court recommends Defendants be granted summary judgment on Plaintiff's claim they failed to follow Covid-19 Directives issued by the Arkansas Department of Health.

### E.  Count IV – Breach of Contract

Plaintiff alleges under state law Defendant Rice had a contract of employment with Union County to provide medical care and treatment to Plaintiff while he was incarcerated in the UCDC. Plaintiff goes to claim, as a beneficiary of that contract she had a duty to provide medical care and treatment to him.  Plaintiff alleges she breached this duty, and he has incurred damages.

The Court's subject matter jurisdiction in this action is premised on the existence of a federal claims – namely, the alleged deliberate indifference to Plaintiff's medical needs, inmate abuse, and failure to comply with directives to limit the spread of Covid-19.  Jurisdiction over the state breach of contract claim, or one for medical malpractice, exists solely by virtue of the

supplemental jurisdiction statute, 28 U.S.C. § 1367, which provides jurisdiction over state law claims forming part of the same "case or controversy" as federal claims.

The exercise of supplemental jurisdiction is discretionary, and where all federal claims have been dismissed prior to trial, the factors to be considered in deciding whether to exercise such jurisdiction – judicial economy, convenience, fairness, comity, and predominance of state issues – typically go against doing so. *Johnson v. City of Shorewood, Minn.,* 360 F.3d 810, 819 (8th Cir. 2004) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). *Accord, e.g., United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Accordingly, I recommend the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims against Defendant Rice for breach of contract/medical malpractice and dismiss the claims without prejudice. *See* 28 U.S.C. § 1367(c)(3) (recognizing a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction").

**F. Official Capacity Claims**

Plaintiff also sues Defendants in their official capacity. Official capacity claims are "functionally equivalent to a suit against the employing governmental entity." *Veatch v. Bartels Lutheran Home,* 627 F.3d 1254, 1257 (8th Cir. 2010). In this case, Plaintiff's official capacity claims against Defendants are treated as claims against Union County. *See Murray v. Lene,* 595 F.3d 868, 873 (8th Cir. 2010).

"[I]t is well established that a municipality [or county] cannot be held liable on a *respondeat superior* theory, that is, solely because it employs a tortfeasor." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1214 (8th Cir. 2013). To establish Union County's liability under section 1983, "plaintiff must show that a constitutional violation was committed pursuant to an official custom, policy, or practice of the governmental entity." *Moyle v. Anderson*, 571 F.3d 814, 817 (8th Cir. 2009) (citation omitted). To establish the existence of an unconstitutional policy, Plaintiff must point to "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).

Here, Plaintiff has failed to produce any summary judgment evidence of a policy or custom of Union County that contributed to the alleged violation of Plaintiff's constitutional rights. Instead, the record confirms Union County had policies in place to protect the rights of inmates regarding medical care, inmate abuse, and Covid-19.

Accordingly, Plaintiff's claims against Defendants in their official capacities fail as a matter of law and I recommend they be granted summary judgment on those claims. [5]

### V. CONCLUSION

For the reasons stated above, I recommend Defendants' Motion for Summary Judgment (ECF No. 73) be **GRANTED.** I also recommend Plaintiff's individual and official capacity claims in Counts I, II, and III against all Defendants be **DISMISSED WITH PREJUDICE** and

---

[5] Because there was no violation of Plaintiff's constitutional rights, it is unnecessary for the Court to address the issue of qualified immunity.

42

Plaintiff's state law claim for breach of contract against Defendant Rice in Count IV be **DISMISSED WITHOUT PREJUDICE**.

I also recommend Lt. **Billy Perry and Sgt. John Ward be TERMINATED as Defendants** because they were never served with process in this case.

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED this 24th day of August 2021.**

/s/ *Barry A. Bryant*
HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

43